Case Number: PC-2025-01726
Filed in Providence/Bristol County Superior Court
Submitted: 3/31/2025 11:53 AM
Envelope: 5063346
Reviewer: Carol M.

1:25-CV-00316-MRD-PAS    Document 1-2    Filed 07/05/25    Page 1 of 57 PageID #: 5

| | |
|---|---|
| **STATE OF RHODE ISLAND**<br>**PROVIDENCE, SC.** | **SUPERIOR COURT** |
| | |
| **SARAH ALABANESE,**<br>　　　　　　　*Plaintiff,* | |
| 　**vs.** | **C.A. No. PC 25-** |
| **LIFESPAN CORPORATION d/b/a**<br>**BROWN UNIVERSITY HEALTH, and**<br>**RHODE ISLAND HOSPITAL,**<br>　　*Defendants.* | |

## COMPLAINT

1.　　This Complaint arises from acts of employment-related disability discrimination, retaliation and violations of state and federal medical leave laws.

## JURISDICTION

2.　　The jurisdiction of this Court is invoked pursuant the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq*., the Rhode Island Parental and Family Medical Leave Act ("R.I. PFMLA"), G.L. 1956 § 28-48-1 *et seq*., the Rhode Island Civil Rights Act ("RICRA"), G.L. 1956 § 42-112-1 *et seq*., and the Rhode Island Whistleblowers Protection Act ("RI WPA"), G.L. 1956 § 28-50-1 *et seq*.

## PARTIES

3.　　Plaintiff, Sarah Albanese ("Plaintiff" or "Albanese") is a citizen of the United States and a resident of the State of Rhode Island.

4.　　Defendant, Lifespan Corporation ("Lifespan") is Plaintiff's former employer.

5.　　Defendant, Rhode Island Hospital ("Hospital"), was the Hospital where Plaintiff worked, and which, at the relevant time, was a Hospital managed and/or owned by Lifespan.

6.　　Defendant Brown University Health is the current name of Lifespan.

7.　　Defendants are sometimes collectively referred to as Plaintiff's employer.

1

Case Number: PC-2025-01726
Filed in Providence/Bristol County Superior Court
Submitted: 3/31/2025 11:53 AM
Envelope: 5063346
Reviewer: Carol M.

1:25-CV-00316-MRD-PAS     Document 1-2     Filed 07/05/25     Page 2 of 57 PageID #: 6

## STATEMENT OF FACTS

5.      Albanese began her employment with Lifespan in August 2020.

6.      At all relevant times, Albanese held the position of Clinical Pharmacist Specialist and for the most part, she was the sole pharmacist assigned to the anticoagulation clinic located in the Center for Primary Care ("CPC") at the Hospital.

7.      Plaintiff's work hours were initially 8 a.m. to 4:30 p.m.

8.      Initially, Albanese's manager was Ian Willoughby ("Willougby") who was the manager of the specialty pharmacy department.

9.      Albanese did not have any problems with Willoughby.

10.      At the time she was hired, the person responsible for overseeing the operation of the anticoagulation clinic was Ruth Dapaah-Afriyie ("Dapaah-Afriyie"), Senior Clinical Pharmacist.

11.      Dapaah-Afriyie was not supposed to be Plaintiff's manager and initially did not have the authority to discipline Albanese.

12.      Despite the fact that Dapaah-Afriyie was not her manager, Albanese worked with her on a daily basis and Dapaah-Afriyie managed her work activities.

13.      Albanese suffers from several mental impairments that qualify for protection under state and federal disability discrimination laws and which also qualify as serious health conditions under state and federal leave laws.

14.      In particular, Albanese suffers from Attention Deficit Hyperactivity Disorder ("ADHD"), Depression and Post-Traumatic Stress Disorder ("PTSD").

15.      In addition, Albanese has a record of the disabilities described herein.

16.      In addition, Plaintiff's employer perceived her as suffering from mental impairments as described herein.

17.      The disabilities listed herein substantially limit Plaintiff in one or more major life activities, including, but not limited to, learning, reading, concentrating, thinking, communicating, and interacting with others.

18.     Despite having these disabilities, at all relevant times, Albanese was able to perform the essential functions of her job.

19.     During the time she was employed by the Defendants, Plaintiff had a positive employment record with respect to patient care and clinical duties and responsibilities.

20.     In September 2020, following a formal evaluation process for the prior year, Dapaah-Afriyie rated Albanese's overall job performance as "Successful Performance."

21.     In December 2020, Albanese requested to change her hours from 8 a.m. to 4:30 p.m. to 10 a.m. to 6:30 p.m.

22.     There were two reasons for her request: one reason was to accommodate her ADHD, which sometimes made it difficult to report to work on time because of the impact of the symptoms on her daily functioning; the second reason was because oftentimes lab results would come in after 4:30 p.m.

23.     One of Plaintiff's job duties was to notify patients of the lab results, which meant she was making phone calls outside of regular work hours when lab results came in after 4:30 p.m.

24.     Plaintiff's request to change her hours was approved.

25.     In April 2021, Plaintiff had a medication change which impacted the severity of her ADHD symptoms.

26.     One of Albanese's job duties was to draft and submit clinical notes associated with patient treatment. At this time, she was having trouble always submitting her clinical notes in a timely manner.

27.     On June 24, 2021, Albanese discussed this issue with Dapaah-Afriyie (that she was behind on her notes).

28.     During the discussion, Dapaah-Afriyie told Albanese that her evaluation was coming up and that if there was an issue, it would have to be noted in her evaluation.

29.     Dapaah-Afriyie told Plaintiff she wanted the backlog cleaned up by the end of July.

30.     During this meeting, Albanese self-disclosed to Dapaah-Afriyie that her ADHD was contributing to her ability to timely submit her clinical notes.

3

Case Number: PC-2025-01726
Filed in Providence/Bristol County Superior Court
Submitted: 3/31/2025 11:53 AM
Envelope: 5063346
Reviewer: Carol M.

CV-00316-MRD-PAS    Document 1-2    Filed 07/05/25    Page 4 of 57 PageID #: 8

31.     Albanese specifically told Dapaah-Afriyie that she had a disability that affects her ability to focus.

32.     Dapaah-Afriyie acknowledged her disability, but told her that she was in a "job whereby you have to learn adapt."

33.     Dapaah-Afriyie stated that she knows people who have ADD in executive positions who are able to adapt and expressed her opinion that Albanese would have to do the same.

34.     Dapaah-Afriyie stated that Albanese's disability "will not always be an acceptable excuse for not functioning at a level you need to function at."

35.     Following the June 2021 meeting, Albanese noticed that her relationship with Dapaah-Afriyie became more difficult.

36.     One of the existing problems was that there was no coverage for Albanese in the clinic.

37.     For example, if Albanese wanted or needed to use her paid time off (PTO) for reasons such as vacation or illness, there was no practical or consistent plan for coverage.

38.     The lack of coverage put a tremendous amount of pressure on Albanese not to take time off, or if she did, to endure the fact that Dapaah-Afriyie responded with hostility and frustration.

39.     Albanese was able to take time off in July 2021 but it led to another negative interaction with Dapaah-Afriyie.

40.     This time, Dapaah-Afriyie became angry at Albanese with regard to an e-mail she sent concerning the issues she was having covering her own vacation, which was copied to Mike Poirier ("Poirier"), Director of Ambulatory Services.

41.     When Albanese returned from her time off, during a one-on-one meeting, Dapaah-Afriyie said she observed that Albanese had recently been late to work, arriving after her 10 a.m. start time, noting that she had been spoken to several times about tardiness.

42.     Dapaah-Afriyie told Albanese she would put it in writing the next time Albanese was late to work.

43.     In August 2021, Albanese submitted a request for intermittent FMLA leave to accommodate her disability.

4

44.     In the FMLA paperwork submitted to Defendants, Albanese listed each of the disabilities cited herein.

45.     Around this time, a meeting was scheduled between Poirier, Dapaah-Afriyie and Albanese regarding the difficulties they were having with coverage.

46.     During this meeting, Dapaah-Afriyie was angry with Albanese.

47.     By this time, Albanese had only been able to take off four days in a year, and had to work remotely on two of those days.

48.     Albanese later met with Poirier alone to express her concern about how she was being treated by Dapaah-Afriyie.

49.     Poirier indicated that he observed the difficulties in Plaintiff's relationship with Dapaah-Afriyie.

50.     Albanese requested to report to someone other than Dapaah-Afriyie. Poirier told her that was not an option.

51.     Albanese further explained to Poirier that she had ADHD and that she attributed some of the relationship issues with Dapaah-Afriyie to Dapaah-Afriyie's lack of understanding of her disability and how her disability impacts some of her work habits or preferred method of communication.

52.     Albanese told Poirier about the statement made by Dapaah-Afriyie that Albanese was using her ADHD as an excuse.

53.     Albanese disclosed to Poirier that she had been experiencing some issues with tardiness, that it was because of her ADHD, that she had trouble getting up on time and leaving the house on time, that things had started to change when she had changed her medication in April, and she also told Poirier about the issue keeping up with her notes.

54.     Albanese explained that, by now, she had in fact cleared up the backlog as requested, but that she was concerned about being disciplined for tardiness.

55.     Albanese was worried that because Dapaah-Afriyie's response to her disclosure about her disability being an excuse, she was going to be punished for tardiness even if it was related to her disability.

5

Case Number: PC-2025-01726
Filed in Providence/Bristol County Superior Court
Submitted: 3/31/2025 11:53 AM
Envelope: 5063346
Reviewer: Carol M.

PC-2025-00316-MRD-PAS    Document 1-2    Filed 07/05/25    Page 6 of 57 PageID #: 10

56.     Albanese told Poirier about how Dapaah-Afriyie compared her to the person she knew with ADD and that if that person was able to function, then she should also be able to function.

57.     Upon information and belief, Poirier did not report to anyone that Albanese complained about being the subject of disability-based discrimination by Dapaah-Afriyie; Poirier did not inform Plaintiff of her options to file a complaint with human resources; and Poirier did not recommend engaging in the interactive process to identify reasonable accommodations or describe those options to Albanese.

58.     Instead, he generally said that they should work on improving the relationship as Dapaah-Afriyie was not going anywhere, and he did not see a way to change the reporting relationship at that time.

59.     In September 2021, Defendants denied Albanese's request for intermittent leave.

60.     In October 2021, Dapaah-Afriyie completed her evaluation of Albanese and did not include any issues with tardiness or her ability to timely complete clinical notes. Again, her overall rating was "Successful Performance."

61.     Despite the evaluation indicating that Plaintiff's performance was "Successful" the treatment by Dapaah-Afriyie did not improve, and instead worsened.

62.     From September to November 2021, three anticoagulation pharmacists were hired and all were trained by Albanese.

63.     In addition, another Clinical Pharmacist Specialist was hired (Robin) who would have the ability to cover for Albanese when she was able to take PTO.

64.     However, all four of these employees were ultimately assigned to the Cardiovascular Clinic ("CVC"), which means by December, there was still no one available to easily cover for Albanese.

65.     In December 2021, Plaintiff informed Dapaah-Afriyie that she intended to request a medical leave of absence.

66.     Albanese told her that the leave was to attend a day program at Butler.

67.     The need for treatment was motivated, in whole or in part, by the manner in which Plaintiff was treated by Dapaah-Afriyie and her working conditions.

68.     This leave was granted.

69.     Albanese took FMLA leave from January 19 to February 20, 2022.

70.     In February, Albanese submitted a proposal for the 1st Annual Pharmacy Innovation Challenge.   The proposal was to start an outpatient geriatrics clinic.

71.      The proposal aligned with prior discussions with Dapaah-Afriyie to have Albanese ultimately transition into a geriatrics-focused pharmacist position outside the anticoagulation clinic.

72.     In March 2022, Dapaah-Afriyie was formally promoted to the position of Manager of Ambulatory Services and became Albanese's official supervisor.

73.     Accordingly, Dapaah-Afriyie now had the authority to discipline Albanese.

74.     Albanese continued having problems with tardiness due to her ADHD, which she previously reported to Poirier and Dapaah-Afriyie.

75.     In March, Dapaah-Afriyie told Albanese she wanted her to call her every morning when she got into the office so that she would know whether Albanese was on-time or not.

76.     On March 28, Albanese received 3rd place in the innovation contest.

77.     Dapaah-Afriyie's negative treatment of Albanese included her failure to provide the support necessary to succeed in this project.

78.     On or about July 28, 2022, Dapaah-Afriyie issued to Plaintiff her first instance of discipline, a verbal warning for reporting late to work.

79.     Dapaah-Afriyie relied on the data she collected from Albanese's daily phone calls.

80.     According to the documentation of the verbal warning, in terms of assistance that would be provided by management to help the employee improve, Dapaah-Afriyie simply wrote that she had already accommodated Plaintiff by changing her start time to 10:00 a.m.

81.     Dapaah-Afriyie did not bring any tardiness-issues to Albanese's attention between July 28 and the date of her next review, except one, until October 3, 2022, a period of about three months.

7

Case Number: PC-2025-01726
Filed in Providence/Bristol County Superior Court
Submitted: 3/31/2025 11:53 AM
Envelope: 5063346
Reviewer: Carol M.

CV-00316-MRD-PAS    Document 1-2    Filed 07/05/25    Page 8 of 57 PageID #: 12

82.    Accordingly, October 3, 2022, when Dapaah-Afriyie and Albanese met, Dapaah-Afriyie told Albanese that she no longer had to call her to document her arrival time on a daily basis.

83.    Significantly, even though she improved her tardiness issues, Dapaah-Afriyie wrote in her comments that she "would like [her] to focus on improving her time management skills. You have been meeting the expectations (arriving to work before 10:00 a.m.) of the corrective action plan. We have to agree on how to proceed, the daily call-in and attendance keeping is exhausting. I still stop that and randomly check on you to ensure your attendance to the Attendance and Tardiness policy."

84.    On October 11, when Albanese got to work, Dapaah-Afriyie was waiting for Albanese in Albanese's office. Dapaah-Afriyie told her she would have to write her up again.

85.    Albanese contacted Eric Smith from Human Resources ("HR") to speak to him about whether there was anything she could do to avoid being disciplined again, because her tardiness was directly connected to her ADHD.

86.    Smith told her she was not eligible for intermittent FMLA because she had taken continuous leave earlier in the year.

87.    Smith told her she might be eligible for an ADA accommodation.

88.    Dapaah-Afriyie wrote her up for tardiness for the second time (which was the first written warning) on October 13.

89.    Eric Smith from HR was present for this meeting.

90.    During this meeting, Albanese tried to discuss possible accommodations.

91.    For example, Albanese asked whether it would be possible to change her start time to 9 a.m. to 5:30 p.m. to accommodate her patients preferred appointment times, and then have a 30-minute range in terms of reporting time as an accommodation.

92.    Smith seemed amenable to the request, as it would not disrupt patient care.

93.    Dapaah-Afriyie rejected the idea because it would be unfair to other employees.

94.     During this meeting, Dapaah-Afriyie informed Albanese that she would no longer be allowed to work at home on Fridays, even though that had been a good way of allowing Albanese to perform necessary administrative duties without distractions.

95.     Albanese viewed this as another form of punishment.

96.     Again, Dapaah-Afriyie expressed a fundamental misunderstanding of the concept of accommodating employees with disabilities and an unwillingness to do so.

97.     During this meeting, Albanese expressed to Dapaah-Afriyie that when she randomly showed up at her office, it made her extremely anxious. Smith said he would look in to a badging system to avoid this problem.

98.     Smith never got back to Albanese about the badging system or about any other possible accommodations.

99.     Smith allowed Dapaah-Afriyie to have the last word on accommodations (i.e., veto power), and neither engaged in the interactive process in good faith.

100.     By early January 2023, Laura McAuliffe ("McAuliffe") had been hired as a Senior Clinical Pharmacist (the same position held by Dapaah-Afriyie).

101.     She was now included in many of the meetings concerning Plaintiff's working conditions.

102.     In early January, another employee was promoted to clinical coordinator of anticoagulation making that employee the manager for all outpatient anticoagulation pharmacists except Albanese.

103.     On January 6, Albanese slept through her alarm and missed two patient appointments.   She was able to see one of the patients later in the date and re-schedule the other.

104.     On January 12, Albanese was called to a meeting and given a final written warning for tardiness.

105.     Defendants knew of her disability and relationship to her tardiness, but continued to essentially ignore the issue.

106.     At this meeting, Dapaah-Afriyie informed Albanese that she was changing her start time back to 9:00 a.m. so she would now have an even earlier start time, but without the 30-minute window requested by Plaintiff.

107.    On the documentation issued with the warning, Dapaah-Afriyie wrote that she will institute weekly check-ins, that Albanese was expected to have consistent punctuality at 9:00 a.m. and that the next action would be termination if Albanese did not meet expectations.

108.    This decision was made again, knowing of Albanese's disability, that she had complained about discrimination by the same person subjecting her to discipline (and been ignored), and despite the fact that Albanese had no substantive performance related problems.

109.    Albanese asked what "weekly, random check-ins" meant. Dapaah-Afriyie told her that she would come by her office unannounced, even though she previously indicated this made her anxious.

110.    On January 20, Albanese reached out to Human Resources, and was able to speak to Cat Cooke ("Cooke") on January 27.

111.    During this call, Albanese complained about disability-based discrimination and how she was being treated by Dapaah-Afriyie.

112.    Cooke did not suggest that Albanese file a complaint or indicate that she would address the hostile work environment directly with Dapaah-Afriyie.

113.    Instead, Cooke advised that Albanese apply for intermittent FMLA and not an ADA accommodation.

114.    Albanese was surprised given that Smith told her to do the opposite.

115.    Cooke informed Albanese this would be a better option because FMLA meant her leave would be job protected and that Dapaah-Afriyie would not be involved in the process – she would not have the authority to deny the leave.

116.    Accordingly, Albanese applied for intermittent leave.

117.    Defendants contracted with a third party, the Reed Group, to handle its FMLA leave process.

118.    Plaintiff completed and submitted the application, including all required information about her disabilities that required the accommodation/leave.

119.    Dapaah-Afriyie was notified of the fact that Plaintiff applied for intermittent FMLA leave.

Case Number: PC-2025-01726
Filed in Providence/Bristol County Superior Court
Submitted: 3/31/2025 11:53 AM
Envelope: 5063346
Reviewer: Carol M.

CV-00316-MRD-PAS     Document 1-2     Filed 07/05/25     Page 11 of 57 PageID
#: 15

120.    Prior to this, Albanese had not informed Dapaah-Afriyie directly that she intended to exercise her right to use FMLA.

121.    On Monday, January 30, when Albanese came to work, Dapaah-Afriyie was waiting for Albanese in her office.

122.    Albanese was four minutes late.

123.    On Tuesday, January 31, when Albanese came to work, Dapaah-Afriyie was sitting in the office next to Albanese's office (which belonged to a nurse). She was sitting in the dark.

124.    This time Albanese was on time. A few minutes later, Dapaah-Afriyie left the office without speaking to Albanese.

125.    Later that day, a meeting took place which involved several medical directors and employees.

126.    Albanese was not part of this meeting.

127.    After the meeting, Liz Pozo ("Pozo") (a medical assistant) reported to Albanese that Dapaah-Afriyie sent a message to the group that Albanese was taking an FMLA leave and the meeting was convened to discuss replacing Albanese.

128.    Another employee who was present at the meeting reported that they actually learned that Plaintiff was giving her two weeks' notice, which was not true.

129.    Albanese reached out to Dr. Messina, who was the CPC Medical Director, to inform him that she was not leaving.

130.    In a text exchange Dr. Messina confirmed that his understanding was that she was taking a leave and would need to be replaced.

131.    At the same time, Dr. Messina told her he was glad to hear she was not leaving because she was an "important part of CPC, I really appreciate the hard work and patient advocacy that you do."

132.    Albanese reported the events of January 30 and 31 to Cooke, expressing her concern that her request for intermittent leave would negatively impact her status and informing her that she believed what Dapaah-Afriyie was doing was "borderline harassment."

11

Case Number: PC-2025-01726
Filed in Providence/Bristol County Superior Court
Submitted: 3/31/2025 11:53 AM
Envelope: 5063346
Reviewer: Carol M.

Case 1:25-CV-00316-MRD-PAS    Document 1-2    Filed 07/05/25    Page 12 of 57 PageID #: 16

133.    Again, Plaintiff's complaints were ignored.

134.    On the morning of February 1, Albanese met with McAuliffe and explained that she had applied for intermittent leave.

135.    Plaintiff followed up with an e-mail to both McAuliffe and Dapaah-Afriyie.

136.    In response, on February 1, Dapaah-Afriyie initiated a group meeting with Albanese, McAuliffe, and Pozo.

137.    During this meeting, Dapaah-Afriyie raised her voice, repeatedly pounding her hand on the table and made the following statements or expressions to Albanese:

    a.    She was angry about the lack of advance notice of Plaintiff's request.

    b.    She reminded Plaintiff several times about the fact that the clinic pays her salary (and therefore, was entitled to know before Plaintiff' requested leave).

    c.    She reminded Albanese several times that it was not Dapaah-Afriyie's decision to hire her (i.e., that she was stuck with her and did not want her).

    d.    Dapaah-Afriyie said she did not know what intermittent leave means.

    e.    She accused Plaintiff of not being transparent.

    f.    She discussed Plaintiff's medication changes (in front of Pozo and McAuliffe).

    g.    Dapaah-Afriyie told her that she did not trust her, that Albanese had never taken any accountability for her actions (i.e., that she was using her disability as an excuse).

    h.    Dapaah-Afriyie told her that she (Dapaah-Afriyie) has taken limited time off, and does not act based on her own selfishness (implying Plaintiff's actions in requesting leave were selfish).

    i.    Dapaah-Afriyie told Albanese her leave would make other employees "suffer."

    j.    Dapaah-Afriyie confirmed that she was the one to inform the group about Plaintiff's request, including Dr. Messina.

Case Number: PC-2025-01726
Filed in Providence/Bristol County Superior Court
Submitted: 3/31/2025 11:53 AM
Envelope: 5063346
Reviewer: Carol M.

1:25-CV-00316-MRD-PAS     Document 1-2     Filed 07/05/25     Page 13 of 57 PageID #: 17

    k.    Dapaah-Afriyie questioned the veracity of Albanese's need for leave in the first place, saying that if she could come in on time at certain times, she should be able to be on time all the time.

    l.    Dapaah-Afriyie told Albanese she has done all she can for her and she is done with her.

    m.    Dapaah-Afriyie said that Plaintiff should stop digging a hole for herself.

    n.    Dapaah-Afriyie told her she can call HR as many times as she wants (implying it will change nothing).

138.    During this meeting, no one told Dapaah-Afriyie she was acting inappropriately toward Albanese or stopped her in any way.

139.    After this meeting, Albanese again complained to Human Resources about how she was being treated by Dapaah-Afriyie in response to her disability and exercise of the right to request accommodation/FMLA.

140.    Again, her complaint was ignored.

141.    Upon information and belief, HR had a meeting with Dapaah-Afriyie this same day and Dapaah-Afriyie expressed her desire to terminate Plaintiff.

142.    On February 8, Plaintiff's intermittent leave request was formally approved by Reed.

143.    Management, including Dapaah-Afriyie and McAuliffe were formally notified.

144.    A meeting was convened to discuss how the intermittent leave would work with Albanese, Cooke, Dapaah-Afriyie and McAuliffe.

145.    During the meeting, Cooke shared the determination letter from Reed.

146.    Cooke informed them all that the leave was retroactive to January 27 and approved through July 27, 2023.

147.    Cooke explained Albanese was given up to 8 hours, to use in 1-hour increments, per week, up to 5 days per week, and that it was job-protected leave.

Case Number: PC-2025-01726
Filed in Providence/Bristol County Superior Court
Submitted: 3/31/2025 11:53 AM
Envelope: 5063346
Reviewer: Carol M.

1:25-CV-00316-MRD-PAS    Document 1-2    Filed 07/05/25    Page 14 of 57 PageID #: 18

148.    Cooke explained that the leave hours could be used to cover tardiness or absences.

149.    Dapaah-Afriyie questioned whether the leave overruled the attendance policy; she complained about how they would cover the clinic in Albanese's absence.

150.    Cooke responded that the FMLA leave did override departmental policy.

151.    Dapaah-Afriyie stated that she did not think Albanese should be able to come to work any time she wanted.

152.    Cooke confirmed that Albanese was entitled to report to work based on her disability-based needs and in accordance with the leave granted.

153.    Cooke confirmed that if Albanese needed to use leave she would call before the start of the shift (9 a.m.) and report how much intermittent time would be used on that occasion and when she would report to work that day.

154.    At the end of the call, Dapaah-Afriyie brought up Albanese's history of tardiness, her corrective action and told everyone on the call if she is sitting in the dark in the office next to Albanese, it was not to monitor Albanese.

155.    Dapaah-Afriyie defensively said she did not have time to be monitoring "you," referring to Albanese.

156.    Dapaah-Afriyie again did not recognize that she should not be subjecting Plaintiff to anger and hostility in response to her exercise of rights.

157.    On February 10, Dapaah-Afriyie confirmed by e-mail her understanding of how the FMLA intermittent process would work for Albanese.

158.    In this e-mail Dapaah-Afriyie wrote that Albanese would need to notify her manager/supervisor of her intent to use FMLA leave by the start of her shift at 9:00 a.m.

159.    In the e-mail, Dapaah-Afriyie wrote that she understood that Albanese's intermittent leave "supersedes organizational and departmental tardiness/call out procedures IF she uses FMLA. Thus, neither the organizational policy to notify the manager/supervisor (an hour before beginning shift) or departmental policy (four hours before beginning shift) is applicable. Likewise, the Center for Primary Care (CPC) clinic's (where Sarah works), requirements for callouts 2 hours (by 6 am) prior to start of clinic."

14

Case Number: PC-2025-01726
Filed in Providence/Bristol County Superior Court
Submitted: 3/31/2025 11:53 AM
Envelope: 5063346
Reviewer: Carol M.

1:25-CV-00316-MRD-PAS    Document 1-2    Filed 07/05/25    Page 15 of 57 PageID #: 19

160.    During the call about the requirements for reporting the use of intermittent leave, or in the meeting, no one required that as a condition of the use of intermittent leave, Albanese need to report or confirm the time she arrived at work after she arrived at work.

161.    Reporting arrival time is not required of similarly-situated non-disabled employees.

162.    Reporting arrival time was not discussed as part of any interactive process.

163.    Reporting arrival time was not a condition of the January 2023 final written warning/corrective action plan.

164.    On February 20, Albanese took one-hour of FMLA leave, which was approved by the Reed Group.

165.    On February 22, a meeting took place between Dapaah-Afriyie, Poirier, Cooke and others to discuss the terms of Albanese's intermittent leave. Although she had only used the FMLA intermittent leave once, upon information and belief, Dapaah-Afriyie did not believe Albanese was using it correctly.

166.    Upon information and belief, Dapaah-Afriyie wanted to impose more conditions, which were retaliatory, discriminatory and designed to make it impossible for Albanese to exercise her rights and/or to set her up to fail.

167.    Albanese was not included in this meeting.

168.    On March 1, Albanese took one-hour of FMLA leave, which was approved by the Reed Group.

169.    On March 8, Albanese took one-hour of FMLA leave, which was approved by the Reed Group.

170.    On each of these three occasions, Plaintiff called the CPC absence line to report her FMLA leave, and also sent an e-mail copying five different people requested by Defendants, including Dapaah-Afriyie and McAuliffe.

171.    On March 10, Dapaah-Afriyie e-mailed Albanese that "after reviewing your approved intermittent claim more thoroughly with HR, some of the information about your approved intermittent FMLA frequency and duration was inaccurate. Therefore, I'm providing an updated, accurate summary below * * *."

15

Case Number: PC-2025-01726
Filed in Providence/Bristol County Superior Court
Submitted: 3/31/2025 11:53 AM
Envelope: 5063346
Reviewer: Carol M.

1:25-CV-00316-MRD-PAS    Document 1-2    Filed 07/05/25    Page 16 of 57 PageID #: 20

172.    Dapaah-Afriyie informed Albanese that "for intermittent leave that *is not foreseeable*, you must still comply with the department's usual and customary call-out procedures for requesting leave, *absent unusual circumstances*."

173.    This meant that instead of calling at the start of her shift, as previously informed, she would now have to report her absence by 6:00 a.m. *unless there were unusual circumstances*.

174.    If there were "unusual circumstances" she could report to the CPC call line and e-mail "prior to" 9:00 a.m.

175.    Dapaah-Afriyie also informed her that instead of 1-hour increments, she could use her leave in 15 minute increments.

176.    Dapaah-Afriyie told Albanese that she was on final written warning for tardiness and any instances not covered by FMLA will lead to termination.

177.    It was at this point that Dapaah-Afriyie included an entirely new requirement for Albanese, informing her that "effective immediately you are to send a daily Teams message to me and Laura from your workstation in your office when you arrive and are ready for work."

178.    This condition was unilaterally imposed even though Albanese had no instances of documented tardiness since January, the accommodation was now in place and the new condition had not been subject to the interactive process.

179.    The Teams message requirement was not required by company policy, FMLA policy, the Reed Group or part of any accommodation plan.

180.    This condition was designed to further harass Plaintiff, to retaliate against her, and to set her up for termination.

181.    Following the e-mail, Albanese contacted Cooke with questions, one of which was whether it was possible for her to be transferred so that Dapaah-Afriyie would no longer be involved in her supervision.

182.    Albanese met with Cooke, who confirmed some of the changes (such as the 15-minute increment and that she had up to 8 hours per day, not per week) outlined in Dapaah-Afriyie's e-mail.

183.    With respect to the need to call in by 6 a.m., Cooke confirmed the call-in was before 9 a.m. because the issue was that she was sleeping through her alarm so she understood she would

16

Case Number: PC-2025-01726
Filed in Providence/Bristol County Superior Court
Submitted: 3/31/2025 11:53 AM
Envelope: 5063346
Reviewer: Carol M.

1:25-CV-00316-MRD-PAS    Document 1-2    Filed 07/05/25    Page 17 of 57 PageID #: 21

most likely not be able to call in at 6 a.m. In other words, Dapaah-Afriyie was wrong about the 6 a.m. requirement.

184.    Plaintiff did not understand the meaning of "unusual circumstances," so she asked Cooke.

185.    Cooke also told her that any other future questions about her intermittent leave should be directed to the Reed Group, including the definition of unusual circumstances.

186.    With respect to the viability of a transfer, Cooke told her that because she has a final written warning she could not be transferred unless her current manager was willing to let her go; and a new manager would have to be willing to accept her.

187.    Cooke did not recognize that when an employee is being subjected to harassment by his or her supervisor, perhaps an exception should be made to the rule.

188.    Plaintiff's complaints were ignored.

189.    Plaintiff followed up with the Reed Group about what "unusual circumstances" meant.

190.    The Reed Group could not answer her question, and instead directed her back to HR. However, Cooke had already told her that the answer to the question was up to the Reed Group.

191.    At that point, even though Plaintiff's disabilities were still impacting her ability to perform major life activities and to report to work on time, she had been harassed to the point where she was afraid to use her FMLA especially given the fact it could only be used in "unusual circumstances," unless she reported it to the absence line at 6 a.m., a term which was still undefined.

192.    The manner in which she had been treated by Dapaah-Afriyie, the fact that no other manager or person from HR intervened or addressed her complaints seriously, worsened Plaintiff's mental health problems.

193.    On April 7, Dapaah-Afriyie asked Albanese for her IP address on her work computer.

194.    Albanese wrote to Cooke informing her that she believed this was another act of harassment.

17

195.   Up until this point, Albanese had still never been disciplined for any lack of productivity, patient care issues or anything related to her core job duties.

196.   Cooke told Albanese to ask Dapaah-Afriyie why she needed the IP information.

197.   When Albanese did not immediately response to Dapaah-Afriyie, Dapaah-Afriyie had another employee tell her that Albanese had 2 minutes to provide it.

198.   After Albanese followed Cooke's directive that she asks Dapaah-Afriyie why she needed the information, Dapaah-Afriyie called her into a meeting with McAuliffe.

199.   Albanese reached out to Cooke for support who said she was not available to attend.

200.   During the meeting Dapaah-Afriyie told Albanese that the request was "per her corrective action."

201.   This was not true because the corrective action did not include any requirement to report her start time daily or anything similar to what was now being required.

202.   During this meeting, Dapaah-Afriyie told her that she was checking the reporting times Albanese submitted and wanted to validate the times because some were too similar.

203.   Dapaah-Afriyie told Albanese repeatedly she was authorized to do this (even if this was not required of all employees) because Albanese was the only one on corrective action for tardiness.

204.   After this meeting, Albanese reported to Cooke what took place, complained (again) that she felt that she was being discriminated against and subjected to retaliation and asked for help.

205.   On April 12, Plaintiff was terminated.

206.   The reason offered by Defendants was the accusation that Plaintiff was not reporting her start times from her work station and therefore, she was non-compliant with the directive to report start times from her work station.

207.   Following her termination, Plaintiff was not permitted to retrieve personal documents from her computer's "one drive."

208.   For example, Plaintiff had teaching materials related to classes that she instructed that she could not access remotely.

Case Number: PC-2025-01726
Filed in Providence/Bristol County Superior Court
Submitted: 3/31/2025 11:53 AM
Envelope: 5063346
Reviewer: Carol M.

1:25-CV-00316-MRD-PAS     Document 1-2     Filed 07/05/25     Page 19 of 57 PageID #: 23

209.    On April 17, Plaintiff received an inquiry from a student about notes for a lecture. She tried to obtain the information from another employee, who did not respond.

210.    Following her termination, Plaintiff sent some text messages to co-workers, with at least concerning the lack of access to her one-drive documents.

211.    On April 19, Lifespan Ambulatory Clinical Pharmacy Services and Dapaah-Afriyie filed an action seeking a civil restraining order against Plaintiff.

212.    The basis for the restraining order alleged in the filing made clear that Defendants perceived Plaintiff as disabled, held negative stereotypes concerning those with mental health issues, and accused Plaintiff as being violent and threatening based on the private text messages (not sent to Dapaah-Afriyie).

213.    In one of the text messages cited by Defendants, Albanese facetiously said that she was contemplating entering her former workplace *after hours when no one was there* to retrieve her own personal documents.

214.    Despite the fact that she did not threaten anyone, Albanese agreed to the terms of the restraining order given the fact that she would be unable to afford a defense, that she would get her documents and based on the agreement that if she did not violate the order (which she knew she would not) the matter would be dismissed.

215.    Plaintiff did not violate the order, and the matter was dismissed in July 2023.

216.    Defendants never turned over Plaintiff's one drive documents.

217.    The fact that Defendants sought a restraining order, and the basis cited in the filing are further evidence of harassment and retaliation.

218.    After Plaintiff's termination, she learned that Defendants' merged the anticoagulation clinic and CVI and that her replacement would learn how to work in both clinics, and the reporting structure changed.

219.    This meant the coverage issue would be resolved, as well as the issue reporting directly to Dapaah-Afriyie, two things that she was repeatedly told were not possible.

220.    In addition, Plaintiff later learned that Dapaah-Afriyie initiated termination proceedings in January 2023, evidencing she planned to terminate Plaintiff well before the incident on April 7.

19

Case Number: PC-2025-01726
Filed in Providence/Bristol County Superior Court
Submitted: 3/31/2025 11:53 AM
Envelope: 5063346
Reviewer: Carol M.

Case 1:25-CV-00316-MRD-PAS    Document 1-2    Filed 07/05/25    Page 20 of 57 PageID #: 24

## COUNT I

### Family and Medical Leave Act ("FMLA")
### 29 U.S.C. § 2601 *et seq.*

221. Plaintiff incorporates by reference Paragraphs 1 through 220 as if fully set forth herein.

222. By the aforesaid actions, Defendants violated and/or willfully violated Plaintiff's proscriptive and prescriptive rights under the FMLA.

223. Plaintiff is damaged as a proximate result of the Defendants' illegal conduct.

## COUNT II

### R.I. Parental and Family Medical Leave Act
### G.L. 1956 § 42-28-1 *et seq.*

224. Plaintiff incorporates by reference Paragraphs 1 through 223 as if fully set forth herein.

225. By the aforesaid actions, Defendants have violated and/or willfully violated Plaintiff's proscriptive and prescriptive rights under the RI PFMLA.

226. Plaintiff is damaged as a proximate result of the Defendants' illegal conduct.

## COUNT III

### R.I. Civil Rights Act ("RICRA")
### G.L. 1956 § 42-112-1 *et seq.*
### Disparate Treatment – Disability

227. Plaintiff incorporates by reference Paragraphs 1 through 226 as if fully set forth herein.

228. By the aforesaid actions, Defendants have discriminated against Plaintiff, in whole or in part, because of her disability or disabilities in violation of RICRA.

229. Plaintiff is damaged as a proximate result of the Defendants' illegal conduct.

Case Number: PC-2025-01726
Filed in Providence/Bristol County Superior Court
Submitted: 3/31/2025 11:53 AM
Envelope: 5063346
Reviewer: Carol M.

1:25-CV-00316-MRD-PAS    Document 1-2    Filed 07/05/25    Page 21 of 57 PageID #: 25

## COUNT IV

### R.I. Civil Rights Act ("RICRA")
### G.L. 1956 § 42-112-1 *et seq.*
### Hostile Work Environment – Disability

230. Plaintiff incorporates by reference Paragraphs 1 through 229 as if fully set forth herein.

231. By the aforesaid actions, Defendants have subjected Plaintiff to a severe and pervasive hostile work environment based upon her disability.

232. The hostile work environment was both subjectively and objectively offensive.

233. Defendants knew or should have known that Plaintiff was subjected to a hostile work environment based upon her disability.

234. Despite Plaintiff's complaints, Defendants failed to take appropriate steps to address and correct the hostile work environment to which Plaintiff was subjected.

235. Defendants are strictly liable for the hostile work environment to which Plaintiff was subjected.

236. Plaintiff is damaged as a proximate result of the Defendants' illegal conduct.

## COUNT V

### R.I. Civil Rights Act ("RICRA")
### G.L. 1956 § 42-112-1 *et seq.*
### Failure-to-Accommodate – Disability

237. Plaintiff incorporates by reference Paragraphs 1 through 236 as if fully set forth herein.

238. During the time Plaintiff was employed by Defendants, she requested a number of reasonable accommodations for her disability or disabilities.

239. With respect to some of the requested accommodations, Defendants violated RICRA by failing to engage in the interactive process and by denying requested accommodations.

240. With respect to some accommodations granted by Defendants, Defendants violated RICRA by unilaterally adding conditions which had not been subject to the interactive process, and/or which were retaliatory.

21

241.  Defendants failed to accommodate Plaintiff's disability or disabilities.

242.  Defendants cannot demonstrate any undue hardship associated with the reasonable accommodations requested by Plaintiff.

243.  Plaintiff is damaged as a proximate result of the Defendants' illegal conduct.

## COUNT VI

### R.I. Civil Rights Act ("RICRA")
### G.L. 1956 § 42-112-1 *et seq.*
### Retaliation

244.  Plaintiff incorporates by reference Paragraphs 1 through 243 as if fully set forth herein.

245.  By the aforesaid actions, Defendants subjected Plaintiff to retaliation in violation of the RICRA.

246.  Plaintiff is damaged as a proximate result of the Defendants' illegal conduct.

## COUNT VII

### R.I. Whistleblowers' Protection Act ("RI WPA")
### G.L. 1956 § 28-50-1 *et seq.*

247.  Plaintiff incorporates by reference Paragraphs 1 through 246 as if fully set forth herein.

248.  By the aforesaid actions, Defendants subjected Plaintiff to retaliation in violation of the RI WPA.

249.  Plaintiff is damaged as a proximate result of the Defendants' illegal conduct.

## PRAYER FOR RELIEF

Plaintiff prays that this Court:

(1) declare that the Defendants' actions complained of are unlawful;
(2) order the Defendants' to make the Plaintiff whole;
(3) order that the Defendants pay Plaintiff compensatory damages;
(4) order that the Defendants pay Plaintiff punitive damages;
(5) order that the Defendants pay Plaintiff liquidated damages;
(6) retain the jurisdiction of this action to ensure full compliance;

Case Number: PC-2025-01726
Filed in Providence/Bristol County Superior Court
Submitted: 3/31/2025 11:53 AM
Envelope: 5063346
Reviewer: Carol M.

1:25-CV-00316-MRD-PAS    Document 1-2    Filed 07/05/25    Page 23 of 57 PageID #: 27

(7) order the Defendants to pay Plaintiff costs and expenses and reasonable attorney's fees;

(8) grant such other relief to Plaintiff as the court deems just and proper.

Plaintiff's damages are in an amount sufficient to invoke the jurisdiction of this Court.

## <u>JURY TRIAL DEMAND</u>

Plaintiff demands a trial by jury.

<div style="margin-left:50%">

Plaintiff,
Sarah Albanese
By her Attorney,

/s/ Carly Beauvais Iafrate
_____
Carly Beauvais Iafrate, #6343
Law Office of Carly B. Iafrate, PC
408 Broadway, 1st Fl.
Providence, RI 02909
(401) 421-0065
ciafrate@verizon.net

</div>

Dated: March 31, 2025

Case Number: PC-2025-01726
Filed in Providence/Bristol County Superior Court
Submitted: 6/3/2025 3:00 PM
Envelope: 5156386
Reviewer: Alexandra R.

25-CV-00316-MRD-PAS    Document 1-2    Filed 07/05/25    Page 24 of 57 PageID
#: 28

| | |
|---|---|
| **STATE OF RHODE ISLAND** **PROVIDENCE, SC.** | **SUPERIOR COURT** |
| **SARAH ALABANESE,** *Plaintiff,* | |
| **vs.** | **C.A. No. PC 25-01726** |
| **LIFESPAN CORPORATION d/b/a BROWN UNIVERSITY HEALTH, and RHODE ISLAND HOSPITAL,** *Defendants.* | |

## FIRST AMENDED COMPLAINT

     1.     This Complaint arises from acts of employment-related disability discrimination, retaliation and violations of state and federal medical leave laws.

## JURISDICTION

     2.     The jurisdiction of this Court is invoked pursuant the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*, the Rhode Island Parental and Family Medical Leave Act ("R.I. PFMLA"), G.L. 1956 § 28-48-1 *et seq.*, the Rhode Island Civil Rights Act ("RICRA"), G.L. 1956 § 42-112-1 *et seq.*, the Rhode Island Whistleblowers Protection Act ("RI WPA"), G.L. 1956 § 28-50-1 *et seq.*, and the Rhode Island Fair Employment Practices Act ("FEPA"), G.L. 1956 § 28-5-1 *et seq.*

## PARTIES

     3.     Plaintiff, Sarah Albanese ("Plaintiff" or "Albanese") is a citizen of the United States and a resident of the State of Rhode Island.

     4.     Defendant, Lifespan Corporation ("Lifespan") is Plaintiff's former employer.

     5.     Defendant, Rhode Island Hospital ("Hospital"), was the Hospital where Plaintiff worked, and which, at the relevant time, was a Hospital managed and/or owned by Lifespan.

     6.     Defendant Brown University Health is the current name of Lifespan.

     7.     Defendants are sometimes collectively referred to as Plaintiff's employer.

Case Number: PC-2025-01726
Filed in Providence/Bristol County Superior Court
Submitted: 6/3/2025 3:00 PM
Envelope: 5156386
Reviewer: Alexandra R.

25-CV-00316-MRD-PAS    Document 1-2    Filed 07/05/25    Page 25 of 57 PageID #: 29

## ADMINISTRATIVE PROCEDURES

8. On or about April 10, 2024, charges of employment discrimination on behalf of Plaintiff, based upon disability and retaliation were filed with the Commission for Human Rights for the State of Rhode Island (the "Commission").

9. On or about April 1, 2025, the Commission issued a "Notice of Right to Sue" to Plaintiff.

10. This Complaint has been filed within ninety (90) days of the receipt of the Notice of Right to Sue.

## STATEMENT OF FACTS

11. Albanese began her employment with Lifespan in August 2020.

12. At all relevant times, Albanese held the position of Clinical Pharmacist Specialist and for the most part, she was the sole pharmacist assigned to the anticoagulation clinic located in the Center for Primary Care ("CPC") at the Hospital.

13. Plaintiff's work hours were initially 8 a.m. to 4:30 p.m.

14. Initially, Albanese's manager was Ian Willoughby ("Willougby") who was the manager of the specialty pharmacy department.

15. Albanese did not have any problems with Willoughby.

16. At the time Albanese was hired, the person responsible for overseeing the operation of the anticoagulation clinic was Ruth Dapaah-Afriyie ("Dapaah-Afriyie"), Senior Clinical Pharmacist.

17. Dapaah-Afriyie was not supposed to be Plaintiff's manager and initially did not have the authority to discipline Albanese.

18. Despite the fact that Dapaah-Afriyie was not her manager, Albanese worked with her on a daily basis and Dapaah-Afriyie managed her work activities.

19. Albanese suffers from several mental impairments that qualify for protection under state and federal disability discrimination laws and which also qualify as serious health conditions under state and federal leave laws.

2

Case Number: PC-2025-01726
Filed in Providence/Bristol County Superior Court
Submitted: 6/3/2025 3:00 PM
Envelope: 5156386
Reviewer: Alexandra R.

25-CV-00316-MRD-PAS    Document 1-2    Filed 07/05/25    Page 26 of 57 PageID #: 30

20.     In particular, Albanese suffers from Attention Deficit Hyperactivity Disorder ("ADHD"), Depression and Post-Traumatic Stress Disorder ("PTSD").

21.     In addition, Albanese has a record of the disabilities described herein.

22.     In addition, Plaintiff's employer perceived her as suffering from mental impairments as described herein.

23.     The disabilities listed herein substantially limit Plaintiff in one or more major life activities, including, but not limited to, learning, reading, concentrating, thinking, communicating, and interacting with others.

24.     Despite having these disabilities, at all relevant times, Albanese was able to perform the essential functions of her job.

25.     During the time she was employed by the Defendants, Plaintiff had a positive employment record with respect to patient care and clinical duties and responsibilities.

26.     In September 2020, following a formal evaluation process for the prior year, Dapaah-Afriyie rated Albanese's overall job performance as "Successful Performance."

27.     In December 2020, Albanese requested to change her hours from 8 a.m. to 4:30 p.m. to 10 a.m. to 6:30 p.m.

28.     There were two reasons for her request: one reason was to accommodate her ADHD, which sometimes made it difficult to report to work on time because of the impact of the symptoms on her daily functioning; the second reason was because oftentimes lab results would come in after 4:30 p.m.

29.     One of Plaintiff's job duties was to notify patients of the lab results, which meant she was making phone calls outside of regular work hours when lab results came in after 4:30 p.m.

30.     Plaintiff's request to change her hours was approved.

31.     In April 2021, Plaintiff had a medication change which impacted the severity of her ADHD symptoms.

32.     One of Albanese's job duties was to draft and submit clinical notes associated with patient treatment. At this time, she was having trouble always submitting her clinical notes in a timely manner.

3

Case Number: PC-2025-01726
Filed in Providence/Bristol County Superior Court
Submitted: 6/3/2025 3:00 PM
Envelope: 5156386
Reviewer: Alexandra R.

25-CV-00316-MRD-PAS    Document 1-2    Filed 07/05/25    Page 27 of 57 PageID #: 31

33.     On June 24, 2021, Albanese discussed this issue with Dapaah-Afriyie (that she was behind on her notes).

34.     During the discussion, Dapaah-Afriyie told Albanese that her evaluation was coming up and that if there was an issue, it would have to be noted in her evaluation.

35.     Dapaah-Afriyie told Plaintiff she wanted the backlog cleaned up by the end of July.

36.     During this meeting, Albanese self-disclosed to Dapaah-Afriyie that her ADHD was contributing to her ability to timely submit her clinical notes.

37.     Albanese specifically told Dapaah-Afriyie that she had a disability that affects her ability to focus.

38.     Dapaah-Afriyie acknowledged her disability, but told her that she was in a job whereby you have to learn adapt.

39.     Dapaah-Afriyie stated that she knows people who have ADD in executive positions who are able to adapt and expressed her opinion that Albanese would have to do the same.

40.     Dapaah-Afriyie stated that Albanese's disability will not always be an acceptable excuse for not functioning at a level you need to function at.

41.     Following the June 2021 meeting, Albanese noticed that her relationship with Dapaah-Afriyie became more difficult.

42.     One of the existing problems was that there was no coverage for Albanese in the clinic.

43.     For example, if Albanese wanted or needed to use her paid time off (PTO) for reasons such as vacation or illness, there was no practical or consistent plan for coverage.

44.     The lack of coverage put a tremendous amount of pressure on Albanese not to take time off, or if she did, to endure the fact that Dapaah-Afriyie responded with hostility and frustration.

45.     Albanese was able to take time off in July 2021 but it led to another negative interaction with Dapaah-Afriyie.

Case Number: PC-2025-01726
Filed in Providence/Bristol County Superior Court
Submitted: 6/3/2025 3:00 PM
Envelope: 5156386
Reviewer: Alexandra R.

25-CV-00316-MRD-PAS    Document 1-2    Filed 07/05/25    Page 28 of 57 PageID #: 32

46.    This time, Dapaah-Afriyie became angry at Albanese with regard to an e-mail she sent concerning the issues she was having covering her own vacation, which was copied to Mike Poirier ("Poirier"), Director of Ambulatory Services.

47.    When Albanese returned from her time off, during a one-on-one meeting, Dapaah-Afriyie said she observed that Albanese had recently been late to work, arriving after her 10 a.m. start time, noting that she had been spoken to several times about tardiness.

48.    Dapaah-Afriyie told Albanese she would put it in writing the next time Albanese was late to work.

49.    In August 2021, Albanese submitted a request for intermittent FMLA leave to accommodate her disability.

50.    In the FMLA paperwork submitted to Defendants, Albanese listed each of the disabilities cited herein.

51.    Around this time, a meeting was scheduled between Poirier, Dapaah-Afriyie and Albanese regarding the difficulties they were having with coverage.

52.    During this meeting, Dapaah-Afriyie was angry with Albanese.

53.    By this time, Albanese had only been able to take off four days in a year, and had to work remotely on two of those days.

54.    Albanese later met with Poirier alone to express her concern about how she was being treated by Dapaah-Afriyie.

55.    Poirier indicated that he observed the difficulties in Plaintiff's relationship with Dapaah-Afriyie.

56.    Albanese requested to report to someone other than Dapaah-Afriyie. Poirier told her that was not an option.

57.    Albanese further explained to Poirier that she had ADHD and that she attributed some of the relationship issues with Dapaah-Afriyie to Dapaah-Afriyie's lack of understanding of her disability and how her disability impacts some of her work habits or preferred method of communication.

58.    Albanese told Poirier about the statement made by Dapaah-Afriyie that Albanese was using her ADHD as an excuse.

Case Number: PC-2025-01726
Filed in Providence/Bristol County Superior Court
Submitted: 6/3/2025 3:00 PM
Envelope: 5156386
Reviewer: Alexandra R.

25-CV-00316-MRD-PAS    Document 1-2    Filed 07/05/25    Page 29 of 57 PageID #: 33

59.     Albanese disclosed to Poirier that she had been experiencing some issues with tardiness, that it was because of her ADHD, that she had trouble getting up on time and leaving the house on time, that things had started to change when she had changed her medication in April, and she also told Poirier about the issue keeping up with her notes.

60.     Albanese explained that, by now, she had in fact cleared up the backlog as requested, but that she was concerned about being disciplined for tardiness.

61.      Albanese was worried that because Dapaah-Afriyie's response to her disclosure about her disability being an excuse, she was going to be punished for tardiness even if it was related to her disability.

62.     Albanese told Poirier about how Dapaah-Afriyie compared her to the person she knew with ADD and that if that person was able to function, then she should also be able to function.

63.     Upon information and belief, Poirier did not report to anyone that Albanese complained about being the subject of disability-based discrimination by Dapaah-Afriyie; Poirier did not inform Plaintiff of her options to file a complaint with human resources; and Poirier did not recommend engaging in the interactive process to identify reasonable accommodations or describe those options to Albanese.

64.     Instead, he generally said that they should work on improving the relationship as Dapaah-Afriyie was not going anywhere, and he did not see a way to change the reporting relationship at that time.

65.     In September 2021, Defendants denied Albanese's request for intermittent leave.

66.     In October 2021, Dapaah-Afriyie completed her evaluation of Albanese and did not include any issues with tardiness or her ability to timely complete clinical notes. Again, her overall rating was "Successful Performance."

67.     Despite the evaluation indicating that Plaintiff's performance was "Successful" the treatment by Dapaah-Afriyie did not improve, and instead worsened.

68.     From September to November 2021, three anticoagulation pharmacists were hired and all were trained by Albanese.

69.     In addition, another Clinical Pharmacist Specialist was hired (Robin) who would have the ability to cover for Albanese when she was able to take PTO.

6

70.     However, all four of these employees were ultimately assigned to the Cardiovascular Clinic ("CVC"), which means by December, there was still no one available to easily cover for Albanese.

71.     In December 2021, Plaintiff informed Dapaah-Afriyie that she intended to request a medical leave of absence.

72.     Albanese told her that the leave was to attend a day program at Butler.

73.     The need for treatment was motivated, in whole or in part, by the manner in which Plaintiff was treated by Dapaah-Afriyie and her working conditions.

74.     This leave was granted.

75.     Albanese took FMLA leave from January 19 to February 20, 2022.

76.     In February, Albanese submitted a proposal for the 1st Annual Pharmacy Innovation Challenge.    The proposal was to start an outpatient geriatrics clinic.

77.      The proposal aligned with prior discussions with Dapaah-Afriyie to have Albanese ultimately transition into a geriatrics-focused pharmacist position outside the anticoagulation clinic.

78.     In March 2022, Dapaah-Afriyie was formally promoted to the position of Manager of Ambulatory Services and became Albanese's official supervisor.

79.     Accordingly, Dapaah-Afriyie now had the authority to discipline Albanese.

80.     Albanese continued having problems with tardiness due to her ADHD, which she previously reported to Poirier and Dapaah-Afriyie.

81.     In March, Dapaah-Afriyie told Albanese she wanted her to call her every morning when she got into the office so that she would know whether Albanese was on-time or not.

82.     On March 28, Albanese received 3rd place in the innovation contest.

83.     Dapaah-Afriyie's negative treatment of Albanese included her failure to provide the support necessary to succeed in this project.

Case Number: PC-2025-01726
Filed in Providence/Bristol County Superior Court
Submitted: 6/3/2025 3:00 PM
Envelope: 5156386
Reviewer: Alexandra R.

25-CV-00316-MRD-PAS     Document 1-2     Filed 07/05/25     Page 31 of 57 PageID #: 35

84.     On or about July 28, 2022, Dapaah-Afriyie issued to Plaintiff her first instance of discipline, a verbal warning for reporting late to work.

85.     Dapaah-Afriyie relied on the data she collected from Albanese's daily phone calls.

86.     According to the documentation of the verbal warning, in terms of assistance that would be provided by management to help the employee improve, Dapaah-Afriyie simply wrote that she had already accommodated Plaintiff by changing her start time to 10:00 a.m.

87.     Dapaah-Afriyie did not bring any tardiness issues to Albanese's attention between July 28 and the date of her next review, except one, until October 3, 2022, a period of about three months.

88.     Accordingly, October 3, 2022, when Dapaah-Afriyie and Albanese met, Dapaah-Afriyie told Albanese that she no longer had to call her to document her arrival time on a daily basis.

89.     Significantly, even though she improved her tardiness issues, Dapaah-Afriyie wrote in her comments that she "would like [her] to focus on improving her time management skills. You have been meeting the expectations (arriving to work before 10:00 a.m.) of the corrective action plan. We have to agree on how to proceed, the daily call-in and attendance keeping is exhausting. I still stop that and randomly check on you to ensure your attendance to the Attendance and Tardiness policy."

90.     On October 11, when Albanese got to work, Dapaah-Afriyie was waiting for Albanese in Albanese's office. Dapaah-Afriyie told her she would have to write her up again.

91.     Albanese contacted Eric Smith from Human Resources ("HR") to speak to him about whether there was anything she could do to avoid being disciplined again, because her tardiness was directly connected to her ADHD.

92.     Smith told her she was not eligible for intermittent FMLA because she had taken continuous leave earlier in the year.

93.     Smith told her she might be eligible for an ADA accommodation.

94.     Dapaah-Afriyie wrote her up for tardiness for the second time (which was the first written warning) on October 13.

95.     Eric Smith from HR was present for this meeting.

Case Number: PC-2025-01726
Filed in Providence/Bristol County Superior Court
Submitted: 6/3/2025 3:00 PM
Envelope: 5156386
Reviewer: Alexandra R.

1:25-CV-00316-MRD-PAS    Document 1-2    Filed 07/05/25    Page 32 of 57 PageID #: 36

96.     During this meeting, Albanese tried to discuss possible accommodations.

97.     For example, Albanese asked whether it would be possible to change her start time to 9 a.m. to 5:30 p.m. to accommodate her patients preferred appointment times, and then have a 30-minute range in terms of reporting time as an accommodation.

98.     Smith seemed amenable to the request, as it would not disrupt patient care.

99.     Dapaah-Afriyie rejected the idea because it would be unfair to other employees.

100.    During this meeting, Dapaah-Afriyie informed Albanese that she would no longer be allowed to work at home on Fridays, even though that had been a good way of allowing Albanese to perform necessary administrative duties without distractions.

101.    Albanese viewed this as another form of punishment.

102.    Again, Dapaah-Afriyie expressed a fundamental misunderstanding of the concept of accommodating employees with disabilities and an unwillingness to do so.

103.    During this meeting, Albanese expressed to Dapaah-Afriyie that when she randomly showed up at her office, it made her extremely anxious. Smith said he would look in to a badging system to avoid this problem.

104.    Smith never got back to Albanese about the badging system or about any other possible accommodations.

105.    Smith allowed Dapaah-Afriyie to have the last word on accommodations (i.e., veto power), and neither engaged in the interactive process in good faith.

106.    By early January 2023, Laura McAuliffe ("McAuliffe") had been hired as a Senior Clinical Pharmacist (the same position held by Dapaah-Afriyie).

107.    McAuliffe was now included in many of the meetings concerning Plaintiff's working conditions.

108.    In early January, another employee was promoted to clinical coordinator of anticoagulation making that employee the manager for all outpatient anticoagulation pharmacists except Albanese.

109.    On January 6, Albanese slept through her alarm and missed two patient appointments.   She was able to see one of the patients later in the date and re-schedule the other.

9

Case Number: PC-2025-01726
Filed in Providence/Bristol County Superior Court
Submitted: 6/3/2025 3:00 PM
Envelope: 5156386
Reviewer: Alexandra R.

25-CV-00316-MRD-PAS     Document 1-2     Filed 07/05/25     Page 33 of 57 PageID #: 37

110. On January 12, Albanese was called to a meeting and given a final written warning for tardiness.

111. Defendants knew of her disability and relationship to her tardiness, but continued to essentially ignore the issue.

112. At this meeting, Dapaah-Afriyie informed Albanese that she was changing her start time back to 9:00 a.m. so she would now have an even earlier start time, but without the 30-minute window requested by Plaintiff.

113. On the documentation issued with the warning, Dapaah-Afriyie wrote that she will institute weekly check-ins, that Albanese was expected to have consistent punctuality at 9:00 a.m. and that the next action would be termination if Albanese did not meet expectations.

114. This decision was made again, knowing of Albanese's disability, that she had complained about discrimination by the same person subjecting her to discipline (and been ignored), and despite the fact that Albanese had no substantive performance related problems.

115. Albanese asked what "weekly, random check-ins" meant. Dapaah-Afriyie told her that she would come by her office unannounced, even though she previously indicated this made her anxious.

116. On January 20, Albanese reached out to Human Resources, and was able to speak to Cat Cooke ("Cooke") on January 27.

117. During this call, Albanese complained about disability-based discrimination and how she was being treated by Dapaah-Afriyie.

118. Cooke did not suggest that Albanese file a complaint or indicate that she would address the hostile work environment directly with Dapaah-Afriyie.

119. Instead, Cooke advised that Albanese apply for intermittent FMLA and not an ADA accommodation.

120. Albanese was surprised given that Smith told her to do the opposite.

121. Cooke informed Albanese this would be a better option because FMLA meant her leave would be job protected and that Dapaah-Afriyie would not be involved in the process – she would not have the authority to deny the leave.

10

Case Number: PC-2025-01726
Filed in Providence/Bristol County Superior Court
Submitted: 6/3/2025 3:00 PM
Envelope: 5156386
Reviewer: Alexandra R.

25-CV-00316-MRD-PAS    Document 1-2    Filed 07/05/25    Page 34 of 57 PageID #: 38

122.    Accordingly, Albanese applied for intermittent leave.

123.    Defendants contracted with a third party, the Reed Group, to handle its FMLA leave process.

124.    Plaintiff completed and submitted the application, including all required information about her disabilities that required the accommodation/leave.

125.    Dapaah-Afriyie was notified of the fact that Plaintiff applied for intermittent FMLA leave.

126.    Prior to this, Albanese had not informed Dapaah-Afriyie directly that she intended to exercise her right to use FMLA.

127.    On Monday, January 30, when Albanese came to work, Dapaah-Afriyie was waiting for Albanese in her office.

128.    Albanese was four minutes late.

129.    On Tuesday, January 31, when Albanese came to work, Dapaah-Afriyie was sitting in the office next to Albanese's office (which belonged to a nurse). She was sitting in the dark.

130.    Albanese was on time. A few minutes later, Dapaah-Afriyie left the office without speaking to Albanese.

131.    Later that day, a meeting took place which involved several medical directors and employees.

132.    Albanese was not part of this meeting.

133.    After the meeting, Liz Pozo ("Pozo") (a medical assistant) reported to Albanese that Dapaah-Afriyie sent a message to the group that Albanese was taking an FMLA leave and the meeting was convened to discuss replacing Albanese.

134.    Another employee who was present at the meeting reported that they actually learned that Plaintiff was giving her two weeks' notice, which was not true.

135.    Albanese reached out to Dr. Messina, who was the CPC Medical Director, to inform him that she was not leaving.

11

Case Number: PC-2025-01726
Filed in Providence/Bristol County Superior Court
Submitted: 6/3/2025 3:00 PM
Envelope: 5156386
Reviewer: Alexandra R.

25-CV-00316-MRD-PAS    Document 1-2    Filed 07/05/25    Page 35 of 57 PageID #: 39

136.    In a text exchange Dr. Messina confirmed that his understanding was that she was taking a leave and would need to be replaced.

137.    At the same time, Dr. Messina told her he was glad to hear she was not leaving because she was an "important part of CPC, I really appreciate the hard work and patient advocacy that you do."

138.    Albanese reported the events of January 30 and 31 to Cooke, expressing her concern that her request for intermittent leave would negatively impact her status and informing her that she believed what Dapaah-Afriyie was doing was "borderline harassment."

139.    Again, Plaintiff's complaints were ignored.

140.    On the morning of February 1, Albanese met with McAuliffe and explained that she had applied for intermittent leave.

141.    Plaintiff followed up with an e-mail to both McAuliffe and Dapaah-Afriyie.

142.    In response, on February 1, Dapaah-Afriyie initiated a group meeting with Albanese, McAuliffe, and Pozo.

143.    During this meeting, Dapaah-Afriyie raised her voice, repeatedly pounding her hand on the table and made the following statements or expressions to Albanese:

a.      She was angry about the lack of advance notice of Plaintiff's request.

b.      She reminded Plaintiff several times about the fact that the clinic pays her salary (and therefore, was entitled to know about Plaintiff' requested leave).

c.      She reminded Albanese several times that it was not Dapaah-Afriyie's decision to hire her (i.e., that she was stuck with her and did not want her).

d.      Dapaah-Afriyie said she did not know what intermittent leave means.

e.      She accused Plaintiff of not being transparent.

f.      She discussed Plaintiff's medication changes (in front of Pozo and McAuliffe).

g.      Dapaah-Afriyie told her that she did not trust her, that Albanese had never taken any accountability for her actions (i.e., that she was using her disability as an excuse).

12

Case Number: PC-2025-01726
Filed in Providence/Bristol County Superior Court
Submitted: 6/3/2025 3:00 PM
Envelope: 5156386
Reviewer: Alexandra R.

25-CV-00316-MRD-PAS    Document 1-2    Filed 07/05/25    Page 36 of 57 PageID
#: 40

h.    Dapaah-Afriyie told her that she (Dapaah-Afriyie) has taken limited time off, and does not act based on her own selfishness (implying Plaintiff's actions in requesting leave were selfish).

i.    Dapaah-Afriyie told Albanese her leave would make other employees suffer.

j.    Dapaah-Afriyie confirmed that she was the one to inform the group about Plaintiff's request, including Dr. Messina.

k.    Dapaah-Afriyie questioned the veracity of Albanese's need for leave in the first place, saying that if she could come in on time at certain times, she should be able to be on time all the time.

l.    Dapaah-Afriyie told Albanese she has done all she can for her and she is done with her.

m.    Dapaah-Afriyie said that Plaintiff should stop digging a hole for herself.

n.    Dapaah-Afriyie told her she can call HR as many times as she wants (implying it will change nothing).

144.    During this meeting, no one told Dapaah-Afriyie she was acting inappropriately toward Albanese or stopped her in any way.

145.    After this meeting, Albanese again complained to Human Resources about how she was being treated by Dapaah-Afriyie in response to her disability and exercise of the right to request accommodation/FMLA.

146.    Again, her complaint was ignored.

147.    Upon information and belief, HR had a meeting with Dapaah-Afriyie this same day and Dapaah-Afriyie expressed her desire to terminate Plaintiff.

148.    On February 8, Plaintiff's intermittent leave request was formally approved by Reed.

149.    Management, including Dapaah-Afriyie and McAuliffe were formally notified.

150.    A meeting was convened to discuss how the intermittent leave would work with Albanese, Cooke, Dapaah-Afriyie and McAuliffe.

13

Case Number: PC-2025-01726
Filed in Providence/Bristol County Superior Court
Submitted: 6/3/2025 3:00 PM
Envelope: 5156386
Reviewer: Alexandra R.

25-CV-00316-MRD-PAS    Document 1-2    Filed 07/05/25    Page 37 of 57 PageID #: 41

151.    During the meeting, Cooke shared the determination letter from Reed.

152.    Cooke informed them all that the leave was retroactive to January 27 and approved through July 27, 2023.

153.    Cooke explained Albanese was given up to 8 hours, to use in 1-hour increments, per week, up to 5 days per week, and that it was job-protected leave.

154.    Cooke explained that the leave hours could be used to cover tardiness or absences.

155.    Dapaah-Afriyie questioned whether the leave overruled the attendance policy; she complained about how they would cover the clinic in Albanese's absence.

156.    Cooke responded that the FMLA leave did override departmental policy.

157.    Dapaah-Afriyie stated that she did not think Albanese should be able to come to work any time she wanted.

158.    Cooke confirmed that Albanese was entitled to report to work based on her disability-based needs and in accordance with the leave granted.

159.    Cooke confirmed that if Albanese needed to use leave she would call before the start of the shift (9 a.m.) and report how much intermittent time would be used on that occasion and when she would report to work that day.

160.    At the end of the call, Dapaah-Afriyie brought up Albanese's history of tardiness, her corrective action and told everyone on the call if she is sitting in the dark in the office next to Albanese, it was not to monitor Albanese.

161.    Dapaah-Afriyie defensively said she did not have time to be monitoring "you," referring to Albanese.

162.    Dapaah-Afriyie again did not recognize that she should not be subjecting Plaintiff to anger and hostility in response to her exercise of rights.

163.    On February 10, Dapaah-Afriyie confirmed by e-mail her understanding of how the FMLA intermittent process would work for Albanese.

164.    In this e-mail Dapaah-Afriyie wrote that Albanese would need to notify her manager/supervisor of her intent to use FMLA leave by the start of her shift at 9:00 a.m.

14

Case Number: PC-2025-01726
Filed in Providence/Bristol County Superior Court
Submitted: 6/3/2025 3:00 PM
Envelope: 5156386
Reviewer: Alexandra R.

25-CV-00316-MRD-PAS    Document 1-2    Filed 07/05/25    Page 38 of 57 PageID #: 42

165.    In the e-mail, Dapaah-Afriyie wrote that she understood that Albanese's intermittent leave "supersedes organizational and departmental tardiness/call out procedures IF she uses FMLA. Thus, neither the organizational policy to notify the manager/supervisor (an hour before beginning shift) or departmental policy (four hours before beginning shift) is applicable. Likewise, the Center for Primary Care (CPC) clinic's (where Sarah works), requirements for callouts 2 hours (by 6 am) prior to start of clinic."

166.    During the call about the requirements for reporting the use of intermittent leave, or in the meeting, no one required that as a condition of the use of intermittent leave, Albanese need to report or confirm the time she arrived at work after she arrived at work.

167.    Reporting arrival time is not required of similarly-situated non-disabled employees.

168.    Reporting arrival time was not discussed as part of any interactive process.

169.    Reporting arrival time was not a condition of the January 2023 final written warning/corrective action plan.

170.    On February 20, Albanese took one-hour of FMLA leave, which was approved by the Reed Group.

171.    On February 22, a meeting took place between Dapaah-Afriyie, Poirier, Cooke and others to discuss the terms of Albanese's intermittent leave. Although she had only used the FMLA intermittent leave once, upon information and belief, Dapaah-Afriyie did not believe Albanese was using it correctly.

172.    Upon information and belief, Dapaah-Afriyie wanted to impose more conditions, which were retaliatory, discriminatory and designed to make it impossible for Albanese to exercise her rights and/or to set her up to fail.

173.    Albanese was not included in this meeting.

174.    On March 1, Albanese took one-hour of FMLA leave, which was approved by the Reed Group.

175.    On March 8, Albanese took one-hour of FMLA leave, which was approved by the Reed Group.

Case Number: PC-2025-01726
Filed in Providence/Bristol County Superior Court
Submitted: 6/3/2025 3:00 PM
Envelope: 5156386
Reviewer: Alexandra R.

25-CV-00316-MRD-PAS     Document 1-2     Filed 07/05/25     Page 39 of 57 PageID #: 43

176.     On each of these three occasions, Plaintiff called the CPC absence line to report her FMLA leave, and also sent an e-mail copying five different people requested by Defendants, including Dapaah-Afriyie and McAuliffe.

177.     On March 10, Dapaah-Afriyie e-mailed Albanese that "after reviewing your approved intermittent claim more thoroughly with HR, some of the information about your approved intermittent FMLA frequency and duration was inaccurate. Therefore, I'm providing an updated, accurate summary below * * *."

178.     Dapaah-Afriyie informed Albanese that "for intermittent leave that *is not foreseeable*, you must still comply with the department's usual and customary call-out procedures for requesting leave, *absent unusual circumstances*."

179.     This meant that instead of calling at the start of her shift, as previously informed, she would now have to report her absence by 6:00 a.m. *unless there were unusual circumstances*.

180.     If there were "unusual circumstances" she could report to the CPC call line and e-mail "prior to" 9:00 a.m.

181.     Dapaah-Afriyie also informed her that instead of 1-hour increments, she could use her leave in 15 minute increments.

182.     Dapaah-Afriyie told Albanese that she was on final written warning for tardiness and any instances not covered by FMLA will lead to termination.

183.     It was at this point that Dapaah-Afriyie included an entirely new requirement for Albanese, informing her that "effective immediately you are to send a daily Teams message to me and Laura from your workstation in your office when you arrive and are ready for work."

184.     This condition was unilaterally imposed even though Albanese had no instances of documented tardiness since January, the accommodation was now in place and the new condition had not been subject to the interactive process.

185.     The Teams message requirement was not required by company policy, FMLA policy, the Reed Group or part of any accommodation plan.

186.     This condition was designed to further harass Plaintiff, to retaliate against her, and to set her up for termination.

16

Case Number: PC-2025-01726
Filed in Providence/Bristol County Superior Court
Submitted: 6/3/2025 3:00 PM
Envelope: 5156386
Reviewer: Alexandra R.

25-CV-00316-MRD-PAS    Document 1-2    Filed 07/05/25    Page 40 of 57 PageID #: 44

187.    Following the e-mail, Albanese contacted Cooke with questions, one of which was whether it was possible for her to be transferred so that Dapaah-Afriyie would no longer be involved in her supervision.

188.    Albanese met with Cooke, who confirmed some of the changes (such as the 15-minute increment and that she had up to 8 hours per day, not per week) outlined in Dapaah-Afriyie's e-mail.

189.    With respect to the need to call in by 6 a.m., Cooke confirmed the call-in was before 9 a.m. because the issue was that she was sleeping through her alarm so she understood she would most likely not be able to call in at 6 a.m. In other words, Dapaah-Afriyie was wrong about the 6 a.m. requirement.

190.    Plaintiff did not understand the meaning of "unusual circumstances," so she asked Cooke.

191.    Cooke also told her that any other future questions about her intermittent leave should be directed to the Reed Group, including the definition of unusual circumstances.

192.    With respect to the viability of a transfer, Cooke told her that because she has a final written warning she could not be transferred unless her current manager was willing to let her go; and a new manager would have to be willing to accept her.

193.    Cooke did not recognize that when an employee is being subjected to harassment by his or her supervisor, perhaps an exception should be made to the rule.

194.    Plaintiff's complaints were ignored.

195.    Plaintiff followed up with the Reed Group about what "unusual circumstances" meant.

196.    The Reed Group could not answer her question, and instead directed her back to HR. However, Cooke had already told her that the answer to the question was up to the Reed Group.

197.    At that point, even though Plaintiff's disabilities were still impacting her ability to perform major life activities and to report to work on time, she had been harassed to the point where she was afraid to use her FMLA especially given the fact it could only be used in "unusual circumstances," unless she reported it to the absence line at 6 a.m., a term which was still undefined.

Case Number: PC-2025-01726
Filed in Providence/Bristol County Superior Court
Submitted: 6/3/2025 3:00 PM
Envelope: 5156386
Reviewer: Alexandra R.

25-CV-00316-MRD-PAS    Document 1-2    Filed 07/05/25    Page 41 of 57 PageID #: 45

198.    The manner in which she had been treated by Dapaah-Afriyie, the fact that no other manager or person from HR intervened or addressed her complaints seriously, worsened Plaintiff's mental health problems.

199.    On April 7, Dapaah-Afriyie asked Albanese for her IP address on her work computer.

200.    Albanese wrote to Cooke informing her that she believed this was another act of harassment.

201.    Up until this point, Albanese had still never been disciplined for any lack of productivity, patient care issues or anything related to her core job duties.

202.    Cooke told Albanese to ask Dapaah-Afriyie why she needed the IP information.

203.    When Albanese did not immediately response to Dapaah-Afriyie, Dapaah-Afriyie had another employee tell her that Albanese had two minutes to provide it.

204.    After Albanese followed Cooke's directive that she ask Dapaah-Afriyie why she needed the information, Dapaah-Afriyie called her into a meeting with McAuliffe.

205.    Albanese reached out to Cooke for support who said she was not available to attend.

206.    During the meeting Dapaah-Afriyie told Albanese that the request was "per her corrective action."

207.    This was not true because the corrective action did not include any requirement to report her start time daily or anything similar to what was now being required.

208.    During this meeting, Dapaah-Afriyie told her that she was checking the reporting times Albanese submitted and wanted to validate the times because some were too similar.

209.    Dapaah-Afriyie told Albanese repeatedly she was authorized to do this (even if this was not required of all employees) because Albanese was the only one on corrective action for tardiness.

210.    After this meeting, Albanese reported to Cooke what took place, complained (again) that she felt that she was being discriminated against and subjected to retaliation and asked for help.

211.    On April 12, Plaintiff was terminated.

18

Case Number: PC-2025-01726
Filed in Providence/Bristol County Superior Court
Submitted: 6/3/2025 3:00 PM
Envelope: 5156386
Reviewer: Alexandra R.

25-CV-00316-MRD-PAS    Document 1-2    Filed 07/05/25    Page 42 of 57 PageID #: 46

212.    The reason offered by Defendants was the accusation that Plaintiff was not reporting her start times from her work station and therefore, she was non-compliant with the directive to report start times from her work station.

213.    Following her termination, Plaintiff was not permitted to retrieve personal documents from her computer's "one drive."

214.    For example, Plaintiff had teaching materials related to classes that she instructed that she could not access remotely.

215.    On April 17, Plaintiff received an inquiry from a student about notes for a lecture. She tried to obtain the information from another employee, who did not respond.

216.    Following her termination, Plaintiff sent some text messages to co-workers, with at least concerning the lack of access to her one-drive documents.

217.    On April 19, Lifespan Ambulatory Clinical Pharmacy Services and Dapaah-Afriyie filed an action seeking a civil restraining order against Plaintiff.

218.    The basis for the restraining order alleged in the filing made clear that Defendants perceived Plaintiff as disabled, held negative stereotypes concerning those with mental health issues, and accused Plaintiff as being violent and threatening based on the private text messages (not sent to Dapaah-Afriyie).

219.    In one of the text messages cited by Defendants, Albanese facetiously said that she was contemplating entering her former workplace *after hours when no one was there* to retrieve her own personal documents.

220.    Despite the fact that she did not threaten anyone, Albanese agreed to the terms of the restraining order given the fact that she would be unable to afford a defense, that she would get her documents and based on the agreement that if she did not violate the order (which she knew she would not) the matter would be dismissed.

221.    Plaintiff did not violate the order, and the matter was dismissed in July 2023.

222.    Defendants never turned over Plaintiff's one drive documents.

223.    The fact that Defendants sought a restraining order, and the basis cited in the filing are further evidence of harassment and retaliation.

19

Case Number: PC-2025-01726
Filed in Providence/Bristol County Superior Court
Submitted: 6/3/2025 3:00 PM
Envelope: 5156386
Reviewer: Alexandra R.

25-CV-00316-MRD-PAS    Document 1-2    Filed 07/05/25    Page 43 of 57 PageID #: 47

224.    After Plaintiff's termination, she learned that Defendants merged the anticoagulation clinic and CVI and that her replacement would learn how to work in both clinics, and the reporting structure changed.

225.    This meant the coverage issue would be resolved, as well as the issue reporting directly to Dapaah-Afriyie, two things that she was repeatedly told were not possible.

226.    In addition, Plaintiff later learned that Dapaah-Afriyie initiated termination proceedings in January 2023, evidencing she planned to terminate Plaintiff well before the incident on April 7.

## COUNT I

### Family and Medical Leave Act ("FMLA")
### 29 U.S.C. § 2601 *et seq.*

227.  Plaintiff incorporates by reference Paragraphs 1 through 227 as if fully set forth herein.

228.  By the aforesaid actions, Defendants violated and/or willfully violated Plaintiff's proscriptive and prescriptive rights under the FMLA.

229.  Plaintiff is damaged as a proximate result of the Defendants' illegal conduct.

## COUNT II

### R.I. Parental and Family Medical Leave Act
### G.L. 1956 § 42-28-1 *et seq.*

230.  Plaintiff incorporates by reference Paragraphs 1 through 229 as if fully set forth herein.

231.  By the aforesaid actions, Defendants have violated and/or willfully violated Plaintiff's proscriptive and prescriptive rights under the RI PFMLA.

232.  Plaintiff is damaged as a proximate result of the Defendants' illegal conduct.

## COUNT III

### R.I. Civil Rights Act ("RICRA")
### G.L. 1956 § 42-112-1 *et seq.*
### Disparate Treatment – Disability

Case Number: PC-2025-01726
Filed in Providence/Bristol County Superior Court
Submitted: 6/3/2025 3:00 PM
Envelope: 5156386
Reviewer: Alexandra R.

25-CV-00316-MRD-PAS    Document 1-2    Filed 07/05/25    Page 44 of 57 PageID #: 48

233. Plaintiff incorporates by reference Paragraphs 1 through 232 as if fully set forth herein.

234. By the aforesaid actions, Defendants have discriminated against Plaintiff, in whole or in part, because of her disability or disabilities in violation of RICRA.

235. Plaintiff is damaged as a proximate result of the Defendants' illegal conduct.

## COUNT IV

### R.I. Civil Rights Act ("RICRA")
### G.L. 1956 § 42-112-1 *et seq.*
### Hostile Work Environment – Disability

236. Plaintiff incorporates by reference Paragraphs 1 through 235 as if fully set forth herein.

237. By the aforesaid actions, Defendants have subjected Plaintiff to a severe and pervasive hostile work environment based upon her disability.

238. The hostile work environment was both subjectively and objectively offensive.

239. Defendants knew or should have known that Plaintiff was subjected to a hostile work environment based upon her disability.

240. Despite Plaintiff's complaints, Defendants failed to take appropriate steps to address and correct the hostile work environment to which Plaintiff was subjected.

241. Defendants are strictly liable for the hostile work environment to which Plaintiff was subjected.

242. Plaintiff is damaged as a proximate result of the Defendants' illegal conduct.

## COUNT V

### R.I. Civil Rights Act ("RICRA")
### G.L. 1956 § 42-112-1 *et seq.*
### Failure-to-Accommodate – Disability

243. Plaintiff incorporates by reference Paragraphs 1 through 242 as if fully set forth herein.

244. During the time Plaintiff was employed by Defendants, she requested a number of reasonable accommodations for her disability or disabilities.

21

245.  With respect to some of the requested accommodations, Defendants violated RICRA by failing to engage in the interactive process and by denying requested accommodations.

246.  With respect to some accommodations granted by Defendants, Defendants violated RICRA by unilaterally adding conditions which had not been subject to the interactive process, and/or which were retaliatory.

247.  Defendants failed to accommodate Plaintiff's disability or disabilities.

248. Defendants cannot demonstrate any undue hardship associated with the reasonable accommodations requested by Plaintiff.

249. Plaintiff is damaged as a proximate result of the Defendants' illegal conduct.

## COUNT VI

### R.I. Civil Rights Act ("RICRA")
### G.L. 1956 § 42-112-1 *et seq.*
### Retaliation

250. Plaintiff incorporates by reference Paragraphs 1 through 249 as if fully set forth herein.

251. By the aforesaid actions, Defendants subjected Plaintiff to retaliation in violation of the RICRA.

252. Plaintiff is damaged as a proximate result of the Defendants' illegal conduct.

## COUNT VII

### R.I. Whistleblowers' Protection Act ("RI WPA")
### G.L. 1956 § 28-50-1 *et seq.*

253. Plaintiff incorporates by reference Paragraphs 1 through 252 as if fully set forth herein.

254. By the aforesaid actions, Defendants subjected Plaintiff to retaliation in violation of the RI WPA.

255. Plaintiff is damaged as a proximate result of the Defendants' illegal conduct.

Case Number: PC-2025-01726
Filed in Providence/Bristol County Superior Court
Submitted: 6/3/2025 3:00 PM
Envelope: 5156386
Reviewer: Alexandra R.

25-CV-00316-MRD-PAS    Document 1-2    Filed 07/05/25    Page 46 of 57 PageID #: 50

## COUNT VIII

### Fair Employment Practices Act ("FEPA")
### G.L. 1956 § 28-5-1 *et seq.*
### Hostile Work Environment – Disability

256. Plaintiff incorporates by reference Paragraphs 1 through 255 as if fully set forth herein.

257. By the aforesaid actions, Defendants have subjected Plaintiff to a severe and pervasive hostile work environment based upon her disability.

258. The hostile work environment was both subjectively and objectively offensive.

259. Defendants knew or should have known that Plaintiff was subjected to a hostile work environment based upon her disability.

260. Despite Plaintiff's complaints, Defendants failed to take appropriate steps to address and correct the hostile work environment to which Plaintiff was subjected.

261. Defendants are strictly liable for the hostile work environment to which Plaintiff was subjected.

262. Plaintiff is damaged as a proximate result of the Defendants' illegal conduct.

## COUNT IX

### Fair Employment Practices Act ("FEPA")
### G.L. 1956 § 28-5-1 *et seq.*
### Failure-to-Accommodate – Disability

263. Plaintiff incorporates by reference Paragraphs 1 through 262 as if fully set forth herein.

264. During the time Plaintiff was employed by Defendants, she requested a number of reasonable accommodations for her disability or disabilities.

265. With respect to some of the requested accommodations, Defendants violated FEPA by failing to engage in the interactive process and by denying requested accommodations.

266. With respect to some accommodations granted by Defendants, Defendants violated FEPA by unilaterally adding conditions which had not been subject to the interactive process, and/or which were retaliatory.

Case Number: PC-2025-01726
Filed in Providence/Bristol County Superior Court
Submitted: 6/3/2025 3:00 PM
Envelope: 5156386
Reviewer: Alexandra R.

25-CV-00316-MRD-PAS    Document 1-2    Filed 07/05/25    Page 47 of 57 PageID #: 51

267.   Defendants failed to accommodate Plaintiff's disability or disabilities.

268.  Defendants cannot demonstrate any undue hardship associated with the reasonable accommodations requested by Plaintiff.

269.  Plaintiff is damaged as a proximate result of the Defendants' illegal conduct.

## COUNT X

### Fair Employment Practices Act ("FEPA")
### G.L. 1956 § 28-5-1 *et seq.*
### Retaliation

270.  Plaintiff incorporates by reference Paragraphs 1 through 269 as if fully set forth herein.

271.  By the aforesaid actions, Defendants subjected Plaintiff to retaliation in violation of the FEPA.

272.  Plaintiff is damaged as a proximate result of the Defendants' illegal conduct.

## COUNT XI

### Fair Employment Practices Act ("FEPA")
### G.L. 1956 § 28-5-1 *et seq.*
### Disparate Treatment

273.  Plaintiff incorporates by reference Paragraphs 1 through 272 as if fully set forth herein.

274.  By the aforesaid actions, Defendants subjected Plaintiff to disparate treatment in violation of the FEPA.

275.  Plaintiff is damaged as a proximate result of the Defendants' illegal conduct.

## PRAYER FOR RELIEF

Plaintiff prays that this Court:

(1) declare that the Defendants' actions complained of are unlawful;
(2) order the Defendants' to make the Plaintiff whole;
(3) order that the Defendants pay Plaintiff compensatory damages;
(4) order that the Defendants pay Plaintiff punitive damages;
(5) order that the Defendants pay Plaintiff liquidated damages;

Case Number: PC-2025-01726
Filed in Providence/Bristol County Superior Court
Submitted: 6/3/2025 3:00 PM
Envelope: 5156386
Reviewer: Alexandra R.

Case 1:25-cv-00316-MRD-PAS    Document 1-2    Filed 07/05/25    Page 48 of 57 PageID #: 52

(6) retain the jurisdiction of this action to ensure full compliance;

(7) order the Defendants to pay Plaintiff costs and expenses and reasonable attorney's fees;

(8) grant such other relief to Plaintiff as the court deems just and proper.

Plaintiff's damages are in an amount sufficient to invoke the jurisdiction of this Court.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury.

<div style="margin-left:50%">

Plaintiff,
Sarah Albanese
By her Attorney,

/s/ Carly Beauvais Iafrate

_____
Carly Beauvais Iafrate, #6343
Law Office of Carly B. Iafrate, PC
408 Broadway, 1st Fl.
Providence, RI 02909
(401) 421-0065
ciafrate@verizon.net

</div>

Dated: June 3, 2025

Case Number: PC-2025-01726
Filed in Providence/Bristol County Superior Court
Submitted: 6/11/2025 2:25 PM
Envelope: 5169504
Reviewer: Carol M.

Case 1:25-CV-00316-MRD-PAS    Document 1-2    Filed 07/05/25    Page 49 of 57 PageID #: 53



# STATE OF RHODE ISLAND JUDICIARY

## SUPERIOR COURT

## SUMMONS

| | |
|---|---|
| | **Civil Action File Number**<br>PC-2025-01726 |
| **Plaintiff**<br>Sarah Albanese<br><br>v.<br><br>Lifespan Corporation d/b/a Brown University<br>Health et al.<br>**Defendant** | **Attorney for the Plaintiff or the Plaintiff**<br>Carly Beauvais Iafrate<br>**Address of the Plaintiff's Attorney or the Plaintiff**<br>408 Broadway<br>1st Floor<br>PROVIDENCE RI  02909 |
| Licht Judicial Complex<br>Providence/Bristol County<br>250 Benefit Street<br>Providence RI  02903<br>(401) 222-3250 | **Address of the Defendant**<br>No Known Address |

**TO THE DEFENDANT, Rhode Island Hospital:**

The above-named Plaintiff has brought an action against you in said Superior Court in the county indicated above. You are hereby summoned and required to serve upon the Plaintiff's attorney, whose address is listed above, an answer to the complaint which is herewith served upon you within twenty (20) days after service of this Summons upon you, exclusive of the day of service.

If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.  Your answer must also be filed with the court.

As provided in Rule 13(a) of the Superior Court Rules of Civil Procedure, unless the relief demanded in the complaint is for damage arising out of your ownership, maintenance, operation, or control of a motor vehicle, or unless otherwise provided in Rule 13(a), your answer must state as a counterclaim any related claim which you may have against the Plaintiff, or you will thereafter be barred from making such claim in any other action.

| | |
|---|---|
| This Summons was generated on 3/31/2025. | /s/ Stephen Burke<br>Clerk |

Witness the seal/watermark of the Superior Court

X *Roberta Masi*

*Roberta Masi*

Case Number: PC-2025-01726
Filed in Providence/Bristol County Superior Court
Submitted: 6/11/2025 2:25 PM
Envelope: 5169504
Reviewer: Carol M.

1:25-CV-00316-MRD-PAS     Document 1-2     Filed 07/05/25     Page 50 of 57 PageID #: 54



# STATE OF RHODE ISLAND JUDICIARY

## SUPERIOR COURT

| **Plaintiff**<br>Sarah Albanese<br> v.<br>Lifespan Corporation d/b/a Brown University Health et al.<br>**Defendant** | **Civil Action File Number**<br>PC-2025-01726 |
| --- | --- |

## PROOF OF SERVICE

I hereby certify that on the date below I served a copy of this Summons, complaint, Language Assistance Notice, and all other required documents received herewith upon the Defendant, Rhode Island Hospital, by delivering or leaving said papers in the following manner:

☐ With the Defendant personally.

☐ At the Defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.
Name of person of suitable age and discretion _____
Address of dwelling house or usual place of abode _____
_____
Age _____
Relationship to the Defendant _____

☐ With an agent authorized by appointment or by law to receive service of process.
Name of authorized agent _____
If the agent is one designated by statute to receive service, further notice as required by statute was given as noted below.
_____

☐ With a guardian or conservator of the Defendant.
Name of person and designation _____

☐ By delivering said papers to the attorney general or an assistant attorney general if serving the state.

☐ Upon a public corporation, body, or authority by delivering said papers to any officer, director, or manager.
Name of person and designation _____

Page 1 of 2

Case Number: PC-2025-01726
Filed in Providence/Bristol County Superior Court
Submitted: 6/11/2025 2:25 PM
Envelope: 5169504
Reviewer: Carol M.

1:25-CV-00316-MRD-PAS    Document 1-2    Filed 07/05/25    Page 51 of 57 PageID #: 55



# STATE OF RHODE ISLAND JUDICIARY

## SUPERIOR COURT

Upon a private corporation, domestic or foreign:

☐ By delivering said papers to an officer or a managing or general agent.
Name of person and designation _____

☒ By leaving said papers at the office of the corporation with a person employed therein.
Name of person and designation _C/o Roberta Masi, Risk Management_

☐ By delivering said papers to an agent authorized by appointment or by law to receive service of process.
Name of authorized agent _____
If the agent is one designated by statute to receive service, further notice as required by statute was given as noted below.
_____

☐ I was unable to make service after the following reasonable attempts: _____
_____
_____

| SERVICE DATE: _6 / 4 / 25_ | SERVICE FEE $ _35_ |
|---|---|
| Month   Day   Year   _11:00AM_ | |

Signature of SHERIFF or DEPUTY SHERIFF or CONSTABLE _____

SIGNATURE OF PERSON OTHER THAN A SHERIFF or DEPUTY SHERIFF or CONSTABLE MUST BE NOTARIZED.

_____
Signature

VINCENT P. CATAMERO
R.I. CONSTABLE #6023

State of _____
County of _____

On this _____ day of _____, 20___, before me, the undersigned notary public, personally appeared _____ ☐ personally known to the notary or ☐ proved to the notary through satisfactory evidence of identification, which was _____, to be the person who signed above in my presence, and who swore or affirmed to the notary that the contents of the document are truthful to the best of his or her knowledge.

Notary Public: _____
My commission expires: _____
Notary identification number: _____

Page 2 of 2

Case Number: PC-2025-01726
Filed in Providence/Bristol County Superior Court
Submitted: 6/11/2025 2:27 PM
Envelope: 5169520
Reviewer: Carol M.

Case 1:25-CV-00316-MRD-PAS    Document 1-2    Filed 07/05/25    Page 52 of 57 PageID #: 56



# STATE OF RHODE ISLAND JUDICIARY

## SUPERIOR COURT

## SUMMONS

|  | **Civil Action File Number**<br>PC-2025-01726 |
|---|---|
| **Plaintiff**<br>Sarah Albanese<br>v.<br>Lifespan Corporation d/b/a Brown University<br>Health et al.<br>**Defendant** | **Attorney for the Plaintiff or the Plaintiff**<br>Carly Beauvais Iafrate |
|  | **Address of the Plaintiff's Attorney or the Plaintiff**<br>408 Broadway<br>1st Floor<br>PROVIDENCE RI  02909 |
| Licht Judicial Complex<br>Providence/Bristol County<br>250 Benefit Street<br>Providence RI  02903<br>(401) 222-3250 | **Address of the Defendant**<br>No Known Address |

**TO THE DEFENDANT, Lifespan Corporation d/b/a Brown University Health:**

The above-named Plaintiff has brought an action against you in said Superior Court in the county indicated above. You are hereby summoned and required to serve upon the Plaintiff's attorney, whose address is listed above, an answer to the complaint which is herewith served upon you within twenty (20) days after service of this Summons upon you, exclusive of the day of service.

If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. Your answer must also be filed with the court.

As provided in Rule 13(a) of the Superior Court Rules of Civil Procedure, unless the relief demanded in the complaint is for damage arising out of your ownership, maintenance, operation, or control of a motor vehicle, or unless otherwise provided in Rule 13(a), your answer must state as a counterclaim any related claim which you may have against the Plaintiff, or you will thereafter be barred from making such claim in any other action.

| This Summons was generated on 3/31/2025. | /s/ Stephen Burke<br>Clerk |
|---|---|

Witness the seal/watermark of the Superior Court

X   Roberta Masi

Roberta Masi

Case Number: PC-2025-01726
Filed in Providence/Bristol County Superior Court
Submitted: 6/11/2025 2:27 PM
Envelope: 5169520
Reviewer: Carol M.

1:25-CV-00316-MRD-PAS    Document 1-2    Filed 07/05/25    Page 53 of 57 PageID #: 57

**STATE OF RHODE ISLAND JUDICIARY**

**SUPERIOR COURT**

| Plaintiff | Civil Action File Number |
|---|---|
| Sarah Albanese | PC-2025-01726 |
| v. | |
| Lifespan Corporation d/b/a Brown University Health et al. | |
| **Defendant** | |

### PROOF OF SERVICE

I hereby certify that on the date below I served a copy of this Summons, complaint, Language Assistance Notice, and all other required documents received herewith upon the Defendant, Lifespan Corporation d/b/a Brown University Health, by delivering or leaving said papers in the following manner:

☐ With the Defendant personally.

☐ At the Defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.
Name of person of suitable age and discretion _____
Address of dwelling house or usual place of abode _____
_____
Age _____
Relationship to the Defendant _____

☐ With an agent authorized by appointment or by law to receive service of process.
Name of authorized agent _____
If the agent is one designated by statute to receive service, further notice as required by statute was given as noted below.
_____

☐ With a guardian or conservator of the Defendant.
Name of person and designation _____

☐ By delivering said papers to the attorney general or an assistant attorney general if serving the state.

☐ Upon a public corporation, body, or authority by delivering said papers to any officer, director, or manager.
Name of person and designation _____

Page 1 of 2

Case Number: PC-2025-01726
Filed in Providence/Bristol County Superior Court
Submitted: 6/11/2025 2:27 PM
Envelope: 5169520
Reviewer: Carol M.

5-CV-00316-MRD-PAS    Document 1-2    Filed 07/05/25    Page 54 of 57 PageID #: 58



# STATE OF RHODE ISLAND JUDICIARY

## SUPERIOR COURT

Upon a private corporation, domestic or foreign:

☐ By delivering said papers to an officer or a managing or general agent.
  Name of person and designation _____

☒ By leaving said papers at the office of the corporation with a person employed therein.
  Name of person and designation _C/o Roberta Mati, Risk Management_

☐ By delivering said papers to an agent authorized by appointment or by law to receive service of process.
  Name of authorized agent _____
  If the agent is one designated by statute to receive service, further notice as required by statute was given as noted below.
  _____

☐ I was unable to make service after the following reasonable attempts: _____
  _____

SERVICE DATE: _6 / 4 / 25_    SERVICE FEE $ _____ 35
           _11:00AM_
Month   Day   Year

Signature of SHERIFF or DEPUTY SHERIFF or CONSTABLE _____

SIGNATURE OF PERSON OTHER THAN A SHERIFF or DEPUTY SHERIFF or CONSTABLE MUST BE NOTARIZED.

_____
Signature                         VINCENT P. CATAMERO
                                  R.I. CONSTABLE #6023

State of _____

County of _____

On this _____ day of _____, 20____, before me, the undersigned notary public, personally appeared _____ ☐ personally known to the notary or ☐ proved to the notary through satisfactory evidence of identification, which was _____, to be the person who signed above in my presence, and who swore or affirmed to the notary that the contents of the document are truthful to the best of his or her knowledge.

Notary Public: _____
My commission expires: _____
Notary identification number: _____

Page 2 of 2

STATE OF RHODE ISLAND                                    SUPERIOR COURT
PROVIDENCE, SC

SARAH ALBANESE
        Plaintiff(s)

v.
                                                C.A. No. PC-2025-01726

LIFESPAN CORPORATION D/B/A
BROWN UNIVERSITY HEALTH, ET AL.
        Defendant(s)

### **ENTRY OF APPEARANCE**

I, James A. Musgrave, hereby enter my appearance on behalf of Rhode Island Hospital

and Lifespan Corporation in the above-entitled matter.


                                        DEFENDANTS
                                        Lifespan Corporation and Rhode Island
                                        Hospital,
                                        By Their Attorney(s),


                                          /s/ James A. Musgrave
                                        _____
                                        James A. Musgrave (#6640)
                                        ROBERTS, CARROLL, FELDSTEIN &
                                        PEIRCE, INC.
                                        Ten Weybosset Street, 8th Floor
                                        Providence, RI   02903
                                        (401) 521-7000    FAX 401-521-1328
                                        jmusgrave@rcfp.com

Case Number: PC-2025-01726
Filed in Providence/Bristol County Superior Court
Submitted: 6/25/2025 11:16 AM
Envelope: 5189050
Reviewer: J'Lyn D.

1:25-CV-00316-MRD-PAS     Document 1-2     Filed 07/05/25     Page 56 of 57 PageID #: 60

## CERTIFICATE OF SERVICE

I hereby certify that, on the 25th day of June, 2025,

[ x ]    I filed and served this document through the electronic filing system on the following parties:

Carly B. Iafrate, Esq.
LAW OFFICE OF CARLY B.
IAFRATE, PC
408 Broadway
First Floor
Providence, RI 02909
ciafrate@verizon.net


The document electronically served is available for viewing and/or downloading from the Rhode Island Judiciary's Electronic Filing System.

[ ]    I caused this document to be [ ] mailed or [ ] hand-delivered to the attorney for the opposing party (and/or the opposing party if self-represented) whose name(s) and address(es) are as follows:


                                    /s/ James A. Musgrave
                            _____

                                                        JAM:jsm
                                                        5375-40
                                                        (4110219)

STATE OF RHODE ISLAND                          SUPERIOR COURT
PROVIDENCE, SC

SARAH ALBANESE
     Plaintiff(s)

v.

                                      C.A. No. PC-2025-01726

LIFESPAN CORPORATION d/b/a
BROWN UNIVERSITY HEALTH and
RHODE ISLAND HOSPITAL
     Defendant(s)

### **STIPULATION**

      Defendants, Lifespan Corporation and Rhode Island Hospital, shall have an additional thirty (30) days that is up to and including July 24, 2025 to answer or otherwise respond to Plaintiff's Complaint.

AGREED AND ASSENTED TO:

DEFENDANTS,                                    PLAINTIFF,
LIFESPAN CORPORATION                           SARAH ALABANESE
AND RHODE ISLAND HOSPITAL                       By Her Attorney,
By Their Attorney(s),


  /s/ James A. Musgrave                            /s/ Carly B. Iafrate
James A. Musgrave (#6640)                       Carly B. Iafrate, Esq.
ROBERTS, CARROLL, FELDSTEIN &                   LAW OFFICE OF CARLY B. IAFRATE, PC
PEIRCE, INC.                                    408 Broadway
Ten Weybosset Street, 8th Floor                 First Floor
Providence, RI 02903                            Providence, RI 02909
(401) 521-7000 FAX 401-521-1328
jmusgrave@rcfp.com                              Date: June 24, 2025


Date: June 24, 2025


                                           JAM:jam
                                           5375-40
                                          (4109959)